**Maya Carol MacGUINEAS, Personal Representative of the Estate of Carol MacGuineas, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 87–855 SSH.**

United States District Court, District of Columbia.

May 25, 1990.

Aaron M. Levine, Washington, D.C., for plaintiff.

AUSA James N. Owens, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This case is a sad one. Carol MacGuineas (MacGuineas), a talented journalist, developed nodular sclerosing Hodgkin's disease in 1984. She was treated for the disease with both radiation and chemotherapy. She agreed to the placement of a Port–A–Cath in order to facilitate the chemotherapy. During the operation in which the Port–A–Cath was being placed, her left innominate vein was punctured and she died. Her daughter, Maya, who is the personal representative of MacGuineas's estate, brought this suit alleging that the doctors who performed the surgery were negligent and that MacGuineas died as a result of their negligence.

Nodular sclerosing Hodgkin's disease is a cancer characterized by a painless, progressive enlargement and hardening of the lymph nodes. There are several stages of Hodgkin's disease. The stages are generally divided into four steps.[1] At the time of the operation, MacGuineas was diagnosed at Stage III.[2]

MacGuineas was receiving treatment from the National Cancer Institute (NCI), National Institute of Health (NIH). When the cancer was first discovered, Carol MacGuineas was treated at NCI with chemotherapy. In February or March 1985, she was deemed to be disease free. Unfortunately, in July 1985, the cancer recurred. MacGuineas again needed treatment. This time she received both chemotherapy and radiation therapy. Such treatment called for regular invasive medication techniques.

In September 1985, Carol MacGuineas volunteered to participate in a study conducted by NCI that compared the infection rates of two commonly-used catheter systems—the Port–A–Cath and the Hickman–Breviac.[3] She was randomly placed in the Port–A–Cath group.

1. The following are short summaries of the stages as set out in 1, *The Merck Manual, General Medicine*, at 759 (14th ed. 1982).

| | |
|---|---|
| STAGE ONE | Disease limited to one anatomic lymph node region. |
| STAGE TWO | Disease involving two or more anatomic lymph node regions on the same side of the diaphragm. |
| STAGE THREE | Disease on both sides of diaphragm involving lymph nodes or spleen. |
| STAGE FOUR | Extranodal involvement such as bone marrow, lung, or liver. |

2. The autopsy report notes that the clinical diagnoses placed MacGuineas in the Stage III–AE level; however, the autopsy report places her at Stage II–A based on the autopsy investigation. In spite of the autopsy report's placing MacGuineas in the Stage II–A, one of her physicians, Dr. Longo, contends that the Stage III–AE staging is correct even in light of the autopsy. [Dr. Longo's testimony, Vol. III, p. 117.]

3. The study was to compare two different types of subclavian venus catheters to determine which offered the lowest risk of site infection. MacGuineas, as a result of previous chemotherapy, basically had run out of peripheral veins; thus she needed such a catheter to facilitate her treatment. The catheter would have allowed, through an internally placed plastic reservoir and internal catheter, the continuous

On September 25, 1985, MacGuineas was admitted to NCI for the insertion of the Port–A–Cath. The Port–A–Cath consists of a plastic and metal reservoir, placed just below the skin in the abdomen area which is connected to a selastic catheter.

Dr. Leong, one of the surgeons who performed the surgery, explained the risks of the Port–A–Cath procedure to MacGuineas. Because it is a blind procedure, certain risks are involved in the implementation of such a catheter. The procedure is blind because the operating surgeon can only monitor his surgical efforts within a limited range by using fluoroscopy.[4]

Dr. Leong and Dr. Norton performed the surgery.[5] They properly placed MacGuineas in the Trendelenburg position. They prepared the left chest cavity for the surgery. Working on the left subclavian vein, they used a syringe to place the needle in the vein.[6] The syringe was removed and a flexible, radiopaque guidewire was threaded through the needle into the vein.[7] The placement and progress of this wire was checked by fluoroscopy.

When the tip of the guidewire appeared to be positioned in the superior vena cava, a tapered plastic cylinder called a dilator was placed over the guidewire into the vein. The dilator separates the tissue so that later in the procedure an introducer can be placed in the vein. The introducer was inserted into the vein. At that point, in a smoothly proceeding placement of the Port–A–Cath, the guidewire and dilator are removed and then the catheter is threaded through the introducer into the vein.

However, in this case, after the introducer was put in place and the wire was removed, the catheter would not pass through the tissue into the vein. Feeling the resistance, the doctors placed the guidewire into the tissue to see if they could determine the point and cause of the resistance.[8] The resistance appeared to be caused by the collapsing of the introducer due to the compression of tissue.

The doctors then decided that the resistance might be overcome by using a wider no. 12 dilator.[9] Because the guidewire had been removed, the entire procedure had to be repeated. The guidewire was reintroduced into the vein, checked with fluoroscopy, and then the doctors tried to place the no. 12 dilator into the vein. They again met resistance. About this time MacGuineas's blood pressure dropped dramatically. At that point the procedure was abandoned and an emergency team was called in. The emergency team discovered a 5 mm tear in the left innominate vein, which they repaired. Unfortunately, in spite of the efforts of the doctors and the emergency team, MacGuineas went into a coma. She was unable to maintain blood pressure on her own and died two days later. The autopsy gave the cause of death as neurologic and cardiac failure, as a result of intraoperative hemorrhage shock caused by

measured release of medication (chemotherapy) without the necessity of repeated invasive procedures.

4. Fluoroscopic examination involves quite a bit of radiation so it is used sparingly and avoided as much as possible.

5. Dr. Leong was a cancer expert at NCI/NIH. He performed at least 60 similar operations while he was at NIH. Dr. Norton is Head of Surgical Metabolism Section, Surgery Branch, NCI/NIH. He performed approximately 50 similar operations.

6. The doctors determined the needle was properly placed by aspiration of the syringe. The blood in the syringe indicated that the needle was in the vein; however, the placement of the needle or the depth of the needle in the vein, because of the nature of the operation, is unknown.

7. The guidewire has one end that is "U" shaped and another which is straight. The "U" end is threaded into the needle. It is very flexible and reforms into its "U" shape in the vein so that the end of the guidewire that is advanced through the vein is rounded, not pointed.

8. The guidewire was placed in straight end first to test the point of resistance in the tissue. The intention was to see if something, perhaps a kink or blood clot, was blocking the path. The guidewire was not advanced to the vein in that instance.

9. No. 12 dilators are commonly used in catherizations. In fact, the no. 12 double lumen dilator is used in the Hickman–Breviac procedure.

laceration of the left innominate vein by a subclavian vein catheter.[10]

Plaintiff claims that the death of Carol MacGuineas was caused by the negligence of the NIH physicians Jeffrey Norton and Stanley Leong. Plaintiff contends that the doctors were negligent because they operated on the wrong side of the body; failed to obtain radiopaque confirmation of the placement of the guidewire; used a wrong size dilator; used excessive force in trying to insert the catheter; and inappropriately proceeded in the face of resistance.[11]

■■■ A physician "is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances."[12] *Shilkret v. Annapolis Emergency Hospital Ass'n,* 276 Md. 187, 349 A.2d 245, 253 (1975). The burden of proof rests upon the plaintiff in a medical malpractice case to show a lack of the requisite skill or care on the part of the defendants. *Id.* 349 A.2d at 247. "A *prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Weimer v. Hetrick,* 309 Md. 536, 525 A.2d 643, 651 (1987) (citing *Waffen v. United States Department of Health & Human Services,* 799 F.2d 911, 915 (4th Cir.1986) [citing *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir.1982) ]).

■■■ On careful scrutiny of the entire record, the Court concludes that plaintiff did not show that it is more likely than not that Dr. Leong or Dr. Norton violated the standard of care. *See Hetrick v. Weimer,* 67 Md.App. 522, 508 A.2d 522, 531 (1986)

**10.** The emergency team found a laceration of the left innominate vein. They repaired it. The autopsy report shows a .5 cm suture line closing the laceration. Microscopic examination showed transmural defect of the vein, but no inflammatory infiltrate, tumor, or radiation changes within the venous wall. [Autopsy report, p. 4.]

The doctors all testified that the preferred vein to enter was the subclavian vein. Doctors

Leong and Norton testified that the fluoroscopy confirmed that the wire was placed into the subclavian vein. However, they also testified that it is difficult to tell for sure which vein the wire is in.

**11.** The venous anatomy from Fischer, *Surgical Nutrition,* at 696:

**12.** The applicable law in this case is the law of Maryland, where the surgery and death occurred. *See, e.g., Waffen v. United States,* 799 F.2d 911 (4th Cir.1986) (case against NIH.)

(quoting trial court), *rev'd Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987) (*aff'g* trial court.) *See also Cooper v. Sisters of Charity of Cincinnati, Inc.*, 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971) (stating that the plaintiff must provide evidence that a defendant's negligence, more likely than not, proximately caused the death).

Eight doctors testified—Dr. Leong, Dr. Norton, Dr. Lawrence, Dr. Odyniec, Dr. Brownlee, Jr., Dr. Longo, Dr. Ferguson, and Dr. Levin. All but Dr. Longo and Dr. Levin testified as to the standard of care for a catheterization procedure. The Court found Dr. Leong, Dr. Norton, Dr. Lawrence, and Dr. Odyniec particularly insightful and credible.[13] Plaintiff primarily relied on the testimony of Dr. Odyniec to show Dr. Leong's and Dr. Norton's alleged departure from the standard of care. The Court notes that while Dr. Odyniec's testimony was that he feels that Dr. Leong and Dr. Norton did not use the standard of care necessary, his testimony of what he would have done under similar circumstances mirrors what Dr. Leong and Dr. Norton did.[14] Furthermore, Dr. Odyniec acknowledged that using a no. 12 dilator is not a departure from the standard of care, nor is going in on the left side, nor is using the straight end of the wire to test the depth of the

obstruction. What he claims was a departure is that in light of the resistance that the doctors were experiencing, and in light of MacGuineas's recent radiation treatment, they did not abort the procedure on the left side and move over to the right side. No conclusive evidence has been presented that the right side is the better or only side on which the procedure should be performed. Similarly, no evidence was presented that shows that the right side would not have been equally affected by the radiation treatment.

 Both doctors have performed similar operations on patients, patients who by the very fact that they were at NCI/NIH had some form of cancer and might have had radiation treatment. The unfortunate fact that MacGuineas died as a result of a complication does not mean that they were negligent, even if the risk of death during such an operation is slim. No doctor "is chargeable with the results of his efforts if he has applied the degree of skill ordinarily required to be expected of a doctor in the performance of the services required." *Hetrick v. Weimer*, 508 A.2d at 529 (quoting trial court). The Court must keep in mind the circumstances as they existed at the time of the surgery and the nature and complexity of the medical problems faced at that time.[15] *Id.* at 529 (stating that if a

---

**13.** All of these doctors have had substantial experience with catheterizations. As mentioned earlier, Dr. Norton had performed at least 50 such operations at the time of the operation; Dr. Leong had performed at least 60; Dr. Lawrence has performed approximately 180, and Dr. Odyniec has inserted Port–A–Caths about 12 times. All of the doctors had good credentials. However, the Court found Dr. Brownlee's testimony inconsistent with the other medical testimony to the extent that the Court discounts Dr. Brownlee's testimony. The Court determines that he did not show sufficient knowledge of the standard of care to enable him to render an informed opinion.

**14.** Q: ... [Y]ou have experienced that the tissue will kink the introducer?

A: Yes.

Q: When that happens, what do you do?

A: What I usually do is put the guide wire back through the introducer and try to see what the tract is and try to deal with the usual dilator where the kinking is—put the dilator in and leave it there for five minutes to see if there

would be any attempt to dilate ... take the dilator out again and try to put the catheter back in. Port–A–Caths are notorious for this because they are such a flimsy catheter so that any level of compression they resist going through the introducer.... On occasion when this does not work, I have removed the whole system and tried to go to a different spot.

Q: On the same side?

A: On the same side.

[Dr. Odyniec, Vol. II, p. 21.]

**15.** *See* testimony of Dr. Lawrence, who has performed 180 similar catheterization operations.

Q: Would you think that radiation might distort the anatomy and the friability of the vein?

A: There is always the potential that radiation or disease can distort or change the nature of the veins that are involved. There wasn't anything in the autopsy, I would suggest, that the anatomy had been in any way distorted by the disease or the irradiation....

Q: Is it at least something to worry about, the fact that you had 4800 rads to that area?

A: Well, up to that time the—

doctor exercised a reasonable degree of care and skill under the circumstances as they existed, and not as we see them in perfect hindsight, then the doctor is not guilty of malpractice). It is obvious to everyone that something went wrong.[16] The doctors were trying to place a catheter in the subclavian vein. Instead, they somehow lacerated the innominate vein. Various explanations exist for why the innominate vein could have been the vein accessed. Access by the innominate vein is not preferred, but it is not a violation of the standard of care. Furthermore, it is not clear from the testimony if the laceration could have been caused by the normal entry of the dilator and that for some reason MacGuineas's vein did not collapse the hole as would be expected.[17] It is clear that the existence of the laceration does not automatically mean that the standard of care was violated. Medicine is an imperfect science. Operations of this nature have risks. The degree of care and skill to be exercised by surgeons

> in the performance of an operation is *not the highest degree of care and skill known to the profession but that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their pa-*

Q: The question is, is it something to worry about, something to be concerned about, when you're going in blind?

A: At that particular time, I would have said no. With the experiences in this case, you know, I think that it is something which, you know, you might think about a little bit more than you might have in the past. With my own experience and with everyone's that I was aware of, no particular problem had been generated by putting these catheters in somebody who had undergone radiation of this nature.

Q: You mean that's the current thing that just happened in the last year or two? Is that what you're telling us?

A: This is the first problem of this magnitude that I'm aware of that was generated by the placement of a catheter of this nature. So as a result of that, this isn't something that I would have been aware of or really thought about much prior to hearing about this case.... I know quite a bit about radiation damage; in fact, I've written papers on it. But the problems involved in placing central venous catheters in irradiated patients were things that I was not aware of prior to the problems that seemed to happen to this particular patient.

Q: Whether you're aware of it or not, in medical science, were they aware of it in 1985? ... The fact that radiation could cause changes in the geography? ...

A: As to whether this is enough of a problem to make placement of a catheter by this method contraindicated, I didn't feel that it was. We didn't have that contraindication of the placement of a catheter at the NIH, and I am not aware that it was a contraindication of the placement of a catheter anywhere in the country. [Vol. III, pp. 73–75.]

16. *See, e.g.,* Dr. Norton's testimony:

Q: What happened in this case?

A: I'm not sure. That's the whole problem.

Q: Is the bottom line of your testimony that you don't know what happened in this case?

A: I can tell you that we've done exactly [that] to patients like this over and over again, like six hundred cases; and we're not sure exactly what happened; and, you know, I wish I knew. [Vol. I, p. 160.]

17. *See* testimony of Dr. Lawrence:

Q: Do you have an opinion as to what happened—why Ms. Macguineas died?

A: I don't and that's one of the things that, you know, worries me in evaluating the procedure as a whole in retrospect. You know, the procedure, as far as I can tell, was carried out in routine fashion. The autopsy findings suggested that the only puncture in the vessel was this one 5 millimeter defect which, to me seemed to be an appropriate one considering the size of the dilator and the catheter that were being utilized.

Q: So you believe that a 5 millimeter hole was an appropriate hole for the size of the dilator and the other instruments?

A: Yes. I haven't measured the diameter of the dilator; but, you know, it's a fairly sizeable dilator; and I would say that it's probably about 5 millimeters in diameter. And that's you know, because there wasn't any abnormal puncture site; there wasn't anything that I could appreciate from reading about what had been done and what the finds were that made me think or made me able to explain why this complication developed. And I think that's one of the things that's of most concern, that is, to me is that I can't say, "yes, I know why this happened in this particular case and why it didn't happen to any number of other people which we put catheters in that were in very, very similar circumstances." ... A number of them had had radiation; a number of them had enlarged lymph nodes because of the tumors that they had. So that there is nothing that I can point to in the case of Ms. MacGuineas where I can say "This is unique" and "This is why this complication occurred in this setting." I wish there was. [Vol. III, pp. 50–51.]

*tients; and the burden of proof is on the [plaintiff] in this case to establish by preponderating evidence a want of such ordinary care and skill in the performance of the operation.*

*Johns Hopkins Hospital v. Genda,* 255 Md. 616, 621–22, 258 A.2d 595, 598–99 (1969) (citing *State, Use of Janney v. Housekeeper,* 70 Md. 162, 16 A. 382 (1889). (Emphasis in original.)

Furthermore, the Court cannot find that it is more likely than not that the doctors used unreasonable force. The Court finds that Dr. Norton and Dr. Leong exhibited a reasonable degree of care and skill. Mrs. MacGuineas's death was very unfortunate and the reason for the laceration of her vein in all probability will never be known, but plaintiff did not prove by a preponderance of evidence that it was the result of negligence.

Accordingly, judgment is entered for the defendant.

SO ORDERED.