Priscilla Sherk **EAST**, etc.

v.

**UNITED STATES of America.**

**Civ. No. B–87–3092.**

United States District Court,
D. Maryland.

Sept. 5, 1990.

James A. Hourihan, and Terri A. Steinhaus, Washington, D.C., for plaintiff.

Breckinridge L. Willcox, U.S. Atty., and Susan M. Ringler and Ira L. Oring, Asst. U.S. Attys., Baltimore, Md., for defendant.

WALTER E. BLACK, JR., District Judge.

Plaintiff Priscilla Sherk East, individually and in her capacity as the personal representative of the estate of her deceased husband, Senator John Porter East, brings this medical malpractice action asserting negligence, wrongful death, and loss of consortium against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq.[1]

In essence, plaintiff alleges that doctors employed by the United States negligently failed to timely diagnose and adequately treat Senator East for hypothyroidism[2] proximately causing the Senator to suffer a severe depression and, ultimately, to take his own life on June 29, 1986.

This case was tried to the Court from March 12, 1990, through May 3, 1990. Following the submission of post-trial briefs, the Court heard closing argument on July 17, 1990. This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

I

At the time of his death, John Porter East was fifty-five years old and the junior senator from the state of North Carolina.

Born on May 5, 1931, in Springfield, Illinois, Senator East had one sibling, Lawrence J. East, who was two years older. His brother suffered from depression and committed suicide in 1966 at the age of 37.

Senator East graduated from Earlham College in 1953 and married Priscilla Sherk East later that same year. In 1955, after two years of military service as a Lieutenant in the United States Marine Corps, Senator East contracted acute poliomyelitis, which deprived him of motor function in his lower extremities, pelvic girdle, and abdominal muscles. After spending time in physical rehabilitation and therapy in Peoria, Illinois, and Warm Springs, Georgia, for the polio, Senator East attended University of Illinois Law School where he excelled academically, placing first in the law school moot court competition and serving as President of the Law Review. After graduating with his law degree in 1959 and practicing law for a little over a

---

1. 28 U.S.C. § 1346(b) provides in relevant part that the district courts shall have exclusive jurisdiction over civil actions for money damages against the United States for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while that employee is acting within the scope of his office or employment, where the United States, if a private person, would be liable according to the law of the place where the act or omission occurred. The parties agree that the law of the District of Columbia should apply to this case under the Federal Tort Claims Act because the alleged negligent acts or omissions by defendant occurred primarily in the District of Columbia. See also 28 U.S.C. § 2674.

2. Hypothyroidism is a disease of the thyroid gland which causes a slowing down of the body's metabolism.

year, Senator East returned to school, receiving a Masters degree and his Doctorate in political science from the University of Florida at Gainesville in 1962 and 1964, respectively.

In 1964, Senator East accepted a position as Assistant Professor of Political Science at East Carolina University in Greenville, North Carolina. Senator East subsequently became a full professor and remained in that position until his election to the Senate in 1980.

Not long after arriving in Greenville, North Carolina, with his wife and two daughters, Senator East became active in Republican politics. During the years from 1965 to 1980, Senator East ran twice unsuccessfully for a seat in the United States House of Representatives, served as an elected member of the Republican National Committee, and participated in the 1976 Republican Convention in Kansas City as a delegate and member of the Platform Committee.

With the backing of North Carolina's senior senator, Jesse Helms, and his political organization, the Congressional Club, Senator East narrowly defeated the incumbent senator in the 1980 general election to become the junior senator from North Carolina. A leading intellectual in the conservative movement and an early supporter of President Reagan, Senator East gained a high profile in the Senate focusing on controversial social issues including abortion, desegregation, and the proper role of the federal judiciary in the United States political system.

With respect to his medical history, from January, 1965, until April, 1983, Senator East's primary care physician was Dr. Donald Tucker, an internist and family friend in Greenville, North Carolina. From April, 1983, to the Senator's death in June, 1986, Dr. Tucker consulted on several occasions with Senator East's government doctors and continued to monitor his care, seeing the Senator during his periodic trips back to North Carolina. Between 1981 and 1986, Dr. Tucker considered himself to be Senator East's personal physician in Greenville.

Under Dr. Tucker's care, Senator East had chronic complaints of constipation which Dr. Tucker attributed to physical inactivity and immobility due to his polio. Having used crutches to walk since contracting polio, Senator East developed shoulder problems in the 1970's which confined him, for the most part, to a wheelchair.

After his election to the Senate in 1980, Senator East had available to him a wide range of medical services through the Office of the Attending Physician ("OAP") located in the United States Capitol.[3] However, during his first two years in the Senate, Senator East used the services of the OAP only for a few minor health problems.

From 1980 to the end of 1982, Senator East continued to see Dr. Tucker, who administered his yearly physical examinations. During this time period, Senator East complained of trouble sleeping and of tension and anxiety which he related to stress from his new job in the Senate. Senator East also had borderline high blood pressure. Dr. Tucker recommended lowering his salt intake and trying relaxation and biofeedback techniques and prescribed Valium for the tension and anxiety.

On April 15, 1983, Dr. Freeman H. Cary, the Attending Physician of the United States Congress, saw Senator East during an office visit. Dr. Cary's progress note reflects that Senator East had an elevated blood pressure which was thought to be related to job stress. After a prolonged conversation, Dr. Cary scheduled a complete physical examination for five days later.

On April 20, 1983, Dr. Cary performed a complete physical examination of Senator East and effectively replaced Dr. Tucker as the Senator's primary care physician. Dr. Cary's notes from the examination state that it was prompted by the Senator's prob-

---

**3.** The Office of the Attending Physician provides medical care and medicine to all members of Congress and the Supreme Court without charge. Patients are seen by the Attending Physician or one of several staff physicians.

lem with hypertension, which the Senator attributed to stress from moving from a college atmosphere to the United States Senate. In addition to elevated blood pressure, the laboratory tests from the examination indicated abnormally high levels of liver enzyme activity, elevated cholesterol, and a slightly abnormal electrocardiogram ("EKG").

Dr. Cary treated Senator East's hypertension with medication and referred him to Dr. Stan Benjamin, a gastroenterologist, for evaluation of the elevated liver enzymes. In his consultation report, Dr. Benjamin could not determine the etiology of the elevation in liver enzymes and recommended that follow-up liver tests be performed.

After the April, 1983, physical examination, Senator East continued to complain to Dr. Cary of tension and anxiety and, in June, 1983, Dr. Cary referred Senator East to Dr. Ralph Gemelli, a psychiatrist with the Department of Psychiatry at the Uniformed Services University of the Health Sciences in Bethesda, Maryland. Senator East saw Dr. Gemelli for psychotherapy during 1983 and 1984 [4] with the main focus of the sessions being the Senator's conflict over whether to seek a second term.

On June 18, 1984, Dr. Cary performed a second routine physical examination of Senator East and found the Senator's health basically unchanged. Dr. Cary's notes state that the Senator's blood pressure had been well controlled with medication, but that the Senator continued to have abnormal EKG and liver enzyme readings. The laboratory tests indicated that Senator East's cholesterol had dropped 50 points since his last physical examination.

On January 22, 1985, Senator East complained of recently feeling fatigued and listless, and Dr. Cary ordered blood tests the next day which revealed low levels of potassium and sodium. Dr. Cary prescribed a potassium supplement with plans to follow up in a week.

On January 30, 1985, Senator East complained of urinary retention, and Dr. Cary referred him to Dr. Kevin J. O'Connell, Chairman of the Department of Urology at Bethesda Naval Hospital. After a visual examination of the urethra and bladder, Dr. O'Connell diagnosed the Senator as having a partial urinary obstruction which was preventing him from urinating. On February 1, 1985, Dr. O'Connell performed a common surgical procedure called a transurethral resection of the prostate ("TURP") operation, removing the obstruction and enabling the Senator to urinate normally.

Dr. Gemelli saw Senator East during his hospitalization for the TURP operation and provided Senator East with a referral to a private psychiatrist more conveniently located to the Senator's home. Dr. Cary's progress note of March 26, 1985, indicates that Senator East was seeing Dr. Joan H. Liverman, a private psychiatrist in Alexandria, Virginia, twice a week, and that Dr. Liverman had requested an increase in the Senator's Valium dosage to control depression.

On April 20, 1985, Senator East was admitted to the psychiatric ward at Bethesda Naval Hospital in a psychotic state and placed under a suicide watch. As part of a routine battery of blood tests performed on patients admitted to the psychiatric ward at Bethesda Naval Hospital, Senator East received a thyroid function test which revealed extremely low levels of thyroid hormone. Based on the blood test results, doctors at Bethesda Naval Hospital diagnosed Senator East as having profound hypothyroidism on April 25, 1985.

After the diagnosis, a consultation with the Department of Endocrinology was ordered and Senator East began treatment for his hypothyroidism with synthetic thyroid hormone. Around the same time, he was transferred from the psychiatric ward to the Internal Medicine Service where he was placed under the care of Dr. John T.

---

4. While plaintiff contends that Senator East saw Dr. Gemelli continuously from September, 1983, through January, 1985, defendant asserts that Senator East voluntarily discontinued treatment with Dr. Gemelli for one year from the fall of 1983 to the fall of 1984 and terminated their therapy sessions in October, 1984.

O'Brian, Chairman of the Department of Endocrinology and his staff residents. Two days after his transfer to Internal Medicine, in a psychotic episode, Senator East attempted to shove a chair leg down his throat, causing a hoarse voice but no permanent injury.

With the initiation of the thyroid replacement therapy, Senator East's physical health steadily improved. However, he continued to experience psychological problems. Senator East was discharged from Bethesda Naval Hospital in late May, 1985, and returned part-time to the Senate two weeks later. Following his discharge, Bethesda Naval Hospital doctors cared for Senator East as an outpatient, following up on his thyroid and psychological conditions. By July, 1985, Senator East's thyroid functioning had returned to normal, rendering him euthyroid.[5]

Between June and early August of 1985, Dr. Mark A. Richardson, a Navy psychiatrist, met with Senator East at Bethesda Naval Hospital for outpatient psychiatric care. During these visits, the Senator intermittently complained of feeling depressed and not his usual self. He blamed Dr. Cary for not detecting his hypothyroidism earlier and subjectively believed that his intellectual and cognitive abilities had been permanently impaired.

In July, 1985, after a Judiciary Committee meeting, the Senator's administrative assistant retrieved a notepad on which Senator East had been doodling and had written the letters M, G, M, G, W, H, T, F and M followed by blank spaces for the remaining letters of each word. The assistant interpreted the writing to refer to a quotation from the Bible: "My God, My God, Why Hast Thou Forsaken Me?".[6] Concerned that Senator East might be suicidal, the assistant along with the Senator's press secretary contacted Dr. Richardson who arranged to see the Senator the following day. Nothing further ensued from this incident.

In early August, 1985, Dr. Richardson learned that Senator East was returning to North Carolina for the summer recess. He recommended that the Senator follow up with Dr. Tucker in two weeks and continue to see a psychiatrist. Dr. Richardson scheduled a return appointment at Bethesda Naval Hospital for September 9, 1985.

On August 8, 1985, Dr. Tucker saw Senator East in Greenville for follow-up concerning his depression and thyroid functioning, noting improvement in his mental condition and no physical manifestations of hypothyroidism. Later in the summer, the Senator's mental condition became worse and Dr. Tucker referred him to Dr. Ray Evans, a psychiatrist. While not having suicidal ideations, Senator East complained of difficulty sleeping and concentrating and stated that he smelled badly. Dr. Evans treated Senator East during September, 1985, and changed his antidepressant medication.

In mid-September, 1985, Senator East announced that he would not seek a second term in the Senate because of poor health. Later that month, he was hospitalized at Pitt County Memorial Hospital in Greenville for urinary retention unrelated to his hypothyroidism.

Senator East returned to Washington, D.C., in October, 1985, missing his previously scheduled appointment with Dr. Richardson. Senator East did not try to recontact Dr. Richardson again, despite efforts by Dr. Richardson to get in touch with him.

Senator East returned to work at the Senate on October 8, 1985. During the fall of 1985, he was obsessed with his mental health and his subjective belief that his intellectual and cognitive abilities had been permanently impaired. Objectively, however, to his close aides and the doctors who saw him, Senator East did not seem intellectually or cognitively impaired at all.

On October 22, 1985, Senator East had a blood sample taken at the OAP. The following day, when there was an inconsisten-

---

**5.** Physicians refer to a patient whose thyroid functioning has returned to normal after treatment as being euthyroid.

**6.** The quotation refers to Jesus Christ's cry of anguish to God while on the cross. *Matthew* 27:46; *Mark* 15:34.

cy between the test results as reported by the OAP and Bethesda, Senator East angrily confronted Dr. Cary, accusing him of being incompetent and ruining his career.[7] After this exchange, he never saw Dr. Cary again.

Shortly after the encounter with Dr. Cary, Dr. O'Brian saw Senator East and recommended he receive psychological testing to dispel his doubts concerning his cognitive ability. Senator East rejected Dr. O'Brian's recommendation. Senator East requested the name of an endocrinologist in order to obtain a second opinion, and Dr. O'Brian recommended Dr. John Canary at Georgetown University Hospital.

Dr. Canary monitored Senator East's thyroid functioning in November and December, 1985. In response to Senator East's complaints of intellectual and cognitive impairment, Dr. Canary recommended the name of a psychologist to perform psychological testing. Senator East did not follow up on this recommendation.

On November 18, 1985, Senator East was admitted to Georgetown University Hospital with agranulocytosis, a condition involving a low white blood cell count, which had been caused by an allergic reaction to the antidepressant medication prescribed by Dr. Evans in North Carolina. During his hospitalization at Georgetown, Senator East was treated primarily by Dr. Dudley P. Jackson. He was also seen by Dr. Canary and, because he was depressed, by Dr. Charles Tartaglia, a psychiatrist.

Following his discharge from Georgetown on December 6, 1985, Senator East asked Dr. Jackson to become his primary care physician. From December 6, 1985, until the Senator's death in June, 1986, Dr. Jackson was the only doctor to see Senator East. Because Senator East continued to complain of depression during this time period, Dr. Jackson recommended on several occasions that he see a psychiatrist, but Senator East never did.

From December, 1985, until June, 1986, Senator East returned to work in the Senate where, despite his severe depression, he managed to attend committee meetings, preside over the Senate, and vote regularly.[8] Senator East also delivered speeches and proofread the galleys for his book on the conservative movement and the political philosophy of its founders which was published after his death. Also during this time, Senator East met with members of the law firm of Hogan & Hartson in order to discuss filing a medical malpractice case against Dr. Cary and the doctors at Bethesda Naval Hospital. As late as May, 1986, a little less than a month before his suicide, Senator East taped a one-hour television interview on the C–SPAN Network during which he engaged in a detailed and extemporaneous discussion on a wide range of subjects, including his career in the Senate, the conservative political movement, the effect of having cameras in the Senate, and his decision not to run for reelection.

While Senator East continued to perform well in public, in private he was racked by insecurity and an obsessive preoccupation with his perceived intellectual and cognitive impairment. When alone with his close aides or family, Senator East would talk incessantly about his health, placing a heavy burden on those close to him. Despite urgings to the contrary by close staff members and his doctors, Senator East was convinced that he had been permanently impaired and refused to see a psychiatrist or undergo psychological testing.

In the spring of 1986, Senator East initiated contact with East Carolina University about returning as a professor of political science. On June 12, 1986, East Carolina offered him such a position and he accepted shortly thereafter.

During the week prior to Senator East's death, Mrs. East went to Wyomissing, Pennsylvania, to transport her mother to a nursing facility in Hilton Head, South Carolina, while the Senator stayed at their

---

7. Plaintiff contends that Dr. Cary admitted at that time that he had thought of doing a thyroid test but had not done so. Defendant disputes this contention.

8. From January 21 to April 25, 1986, Senator East had a 100 percent voting record.

apartment in Alexandria, Virginia. During that week, Senator East presided over a Senate debate concerning a judicial nomination, and met with Judge Antonin Scalia who recently had been nominated to the Supreme Court.

On June 28, 1986, Senator East returned to North Carolina driven by an aide, John Petree. That night Senator East had dinner with his daughter Kathryn and a friend whom she had invited to prevent her father from rambling on about his health. They left around midnight. Sometime thereafter during the early morning of June 29, 1986, Senator East sealed himself in his garage and turned on the ignition of his car. His body, asphyxiated by the carbon monoxide, was found the next morning by Petree. On top of a trash can next to the body, there was a suicide note which read:

> By failing to diagnose the hypothyroid condition in time (as they should have) the attending physician, Dr. Cary, and the Bethesda physicians ruined my health. I can't go on. I love my family so.

## II

■ In a medical malpractice case where ordinary negligence elements are applied to medical diagnosis and treatment, the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached the standard of care, and that the breach proximately caused the plaintiff's injuries. *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 623–24 (D.C. 1986); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979).

■ The duty of care owed by a nationally certified doctor or specialist is measured by a national standard[9] and is generally described as that degree of care expected of other medical professionals with similar skills acting under the same or similar circumstances. *Snead v. United States,* 595 F.Supp. 658, 663 (D.C.Cir.1984); *Robbins v.*

*Footer,* 553 F.2d 123, 129 (D.C.Cir.1977); *Morrison,* 407 A.2d at 561.

■ The degree of care and skill required of doctors in the treatment of their patients is not the highest degree of care and skill known to the profession, but that reasonable degree of care and skill which doctors ordinarily exercise in such treatment. *MacGuineas v. United States,* 738 F.Supp. 566, 571–2 (D.D.C.1990). Similarly, a doctor cannot be found liable simply because another doctor criticizes the care provided and would not have provided the same care. *See Ramsey v. Physician's Memorial Hospital,* 36 Md.App. 42, 49, 373 A.2d 26, 29 (Md.Ct.Spec.App.1977).

■ A doctor's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment and not retrospectively. *MacGuineas,* 738 F.Supp. at 570–71. If a doctor exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the doctor is not liable for malpractice. *Id.*

"To establish proximate cause, plaintiff must present evidence from which a reasonable [trier of fact] could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable." *Psychiatric Institute of Washington,* 509 A.2d at 624.

In this case, plaintiff alleges that Drs. Cary, Gemelli, and O'Connell breached the applicable standard of care by failing to diagnose Senator East's hypothyroidism prior to his April, 1985, hospitalization at Bethesda Naval Hospital. Plaintiff further alleges that Drs. Gemelli and Cary, as well as Dr. Bartholomew T. Hogan, Chairman of the Department of Psychiatry at Bethesda Naval Hospital, breached the standard of care by failing to provide Senator East with adequate psychiatric follow-up between September, 1985, and June, 1986.

---

**9.** *Robbins v. Footer,* 553 F.2d 123, 129 (D.C.Cir. 1977) (national standard of care applies to nationally certified specialists); *Morrison,* 407

A.2d at 565 (national standard of care applies to nationally certified physicians and other health care providers).

In support of the negligence claims in this case, plaintiff presented four expert witnesses. Dr. John J. Hughes, a private internist in Washington, D.C., and Dr. John J. Canary, an endocrinologist at Georgetown University Hospital, testified as to the applicable standard of care and alleged breaches of the standard of care by Dr. Cary, an internist. Dr. Canary also testified regarding the standard of care and alleged breaches by Dr. O'Connell, a urologist. Dr. Peter C. Whybrow, a psychiatrist and professor at the University of Pennsylvania School of Medicine specializing in psychiatric aspects of endocrine disorders, and Dr. James C. Cavanaugh, Jr., a forensic psychiatrist at Rush–Presbyterian–St. Luke's Medical Center in Chicago, Illinois, testified concerning the standard of care and alleged breaches by Dr. Gemelli, a psychiatrist. Dr. Whybrow also testified as to alleged breaches by Dr. Hogan in failing to make attempts to get Senator East into psychiatric treatment in the fall and winter of 1985.

In defending the negligence claims, the United States also presented four expert witnesses. Dr. Lewis E. Braverman, Director of Endocrinology at University of Massachusetts Medical Center, testified as to the standard of care and professional performance of Dr. Cary. Dr. Robert T. Rubin, a psychiatrist with the Division of Biological Psychiatry at the UCLA Medical Center, and Dr. Martin B. Keller, a psychiatrist with the Department of Psychiatry at Massachusetts General Hospital, testified as to the standard of care and conduct of Dr. Gemelli. Dr. Patrick C. Walsh, Director of Urology at the Johns Hopkins University Hospital, testified concerning the standard of care and performance of Dr. O'Connell.

Resolution of the issues presented in this litigation is heavily dependent on the guidance afforded the Court by the testimony of the experts. The Court must consider each expert's professional background, his knowledge of the medical issues being addressed, the logic of his analysis of these issues, the facts upon which he based his expert opinion, and his manner and demeanor while testifying on the witness stand, particularly as it relates to his objectivity in reaching this expert opinion.

Among all of the experts, the Court found the testimony of Dr. Braverman to be the most balanced, authoritative, and persuasive. Among plaintiff's experts, the Court found Dr. Canary to be a credible witness, although his opinions gave the Court certain concerns which will be addressed later. The Court could not accord as much weight to the testimony of Drs. Cavanaugh and Whybrow and, to a lesser extent, Dr. Hughes, because of their overzealous, one-sided advocacy on behalf of plaintiff, a stance more appropriate for trial counsel than the witnesses. Defendant's remaining experts, Drs. Rubin, Keller, and Walsh, were of assistance to the Court on certain narrower issues in the fields of psychiatry and urology.

Dr. Lewis E. Braverman is an endocrinologist [10] specializing in problems related to the thyroid gland and is recognized as one of the leading clinical thyroid specialists in the country. From 1983 to the present, Dr. Braverman has been co-editor of *The Thyroid,* a widely used and respected reference textbook for diseases of the thyroid often referred to as the Bible of thyroid disease. In addition, Dr. Braverman serves as editor-in-chief of *The Journal of Clinical Endocrinology and Metabolism,* a leading clinical research journal published by the American Endocrine Society, and co-editor of the *Yearbook of Endocrinology* with responsibility for the section on the thyroid. The *Yearbook* abstracts the most important articles in endocrinology each year.

Dr. Braverman received his B.S. from Harvard College and his M.D. from Johns Hopkins University School of Medicine. He received training in internal medicine at various components of Harvard's teaching hospitals and specialized in endocrinology

**10.** Endocrinology is a subspecialty of internal medicine concerned primarily with glands and internal secretion.

and the thyroid as a research fellow at Harvard Medical School.

After a period of service at Tufts Medical School, in 1975, Dr. Braverman moved to the University of Massachusetts Medical School where he established a division of endocrinology and metabolism and serves as its director. He is also Chairman of the Nuclear Medicine Department and Professor of Medicine, Nuclear Medicine, and Physiology.

Dr. Braverman's current responsibilities include clinical care of patients, many of whom suffer from hypothyroidism, research concerning thyroid disorders, and teaching and training of medical students, internal medicine residents, and endocrinology fellows. Dr. Braverman also periodically serves as an attending physician on the internal medicine ward at the University hospital. Dr. Braverman estimated that he has seen between seven and ten thousand patients with hypothyroidism since 1960.

The Court notes that Dr. Braverman has never testified before as an expert witness. The Court found him to be an eminently qualified expert on diseases of the thyroid and hypothyroidism in particular.

Because of the technical nature of the subject matter of this trial, it is appropriate at the outset to review some of the medical background related to hypothyroidism, its signs and symptoms, and its diagnosis. While the Court gained its understanding of these matters largely through the testimony of Dr. Braverman, the testimony of other experts on these general subjects was not inconsistent except in those respects that are specifically addressed.

The thyroid gland is located in the middle of the neck above the Adam's apple and is controlled by the anterior pituitary gland which is located just below the brain. The pituitary, in turn, is connected by a stalk to the hypothalamus which is part of the brain. The hypothalamus secretes a hormone[11] called TRH or thyrotropin releasing hormone. TRH stimulates the anterior pituitary gland to synthesize and secrete thyrotropin, which is also called TSH or thyroid stimulating hormone. TSH then in turn stimulates the thyroid gland to bring iodine into the thyroid. Through a variety of metabolic processes, the thyroid synthesizes a thyroid hormone called T4 and secretes it into the blood stream where most of the T4 is converted into T3 by an enzyme which removes one of its four iodine molecules. Finally, unbound or free thyroid hormone enters the body's peripheral tissues and cells, stimulating the body's metabolism.

The amounts of thyroid hormone are carefully regulated within a healthy person. If there is not enough thyroid hormone in the blood, the pituitary gland will increase production and release TSH in order to stimulate the thyroid to produce more thyroid hormone. Where a person consistently lacks sufficient thyroid hormone circulating in the body, causing the person's metabolism to slow down, the condition is described as hypothyroidism. In primary hypothyroidism, as here, the thyroid gland does not produce adequate T4 hormone which, in turn, causes the pituitary to secrete increased amounts of TSH. The abnormal thyroid does not respond to the increased TSH. A patient with hypothyroidism, therefore, will present with a high TSH level and low T3 and T4 thyroid hormone levels.

Dr. Braverman describes four major causes of hypothyroidism or an underactive thyroid. The first two are caused by thyroid surgery or radioactive iodine treatment. The third cause is Hashimoto's thyroiditis,[12] an autoimmune disease in which the thyroid, over a course of many years, is invaded by lymphocytes, small white blood cells, which induce the destruction of the thyroid's mechanism for making thyroid hormone. Based on testimony which relied on the autopsy, the Court finds that Senator East's hypothyroidism most likely was

---

**11.** A hormone is a protein secreted by an endocrine gland into the bloodstream that acts on other tissues in the body.

**12.** Hashimoto's thyroiditis is the major cause of hypothyroidism in patients from the United States who do not have surgery or radioactive iodine treatment.

**1152**

caused by Hashimoto's thyroiditis. The fourth cause of hypothyroidism is unknown; the thyroid gland simply atrophies and disappears.

Hypothyroidism is primarily a woman's disease; it occurs in approximately eight to nine women for each man, typically in women over the age of 60. Most patients with hypothyroidism or thyroid disease have a relative who has thyroid disease.

Because it is so gradual in onset, hypothyroidism due to Hashimoto's thyroiditis can be very confounding and difficult to diagnose.[13] According to Dr. Braverman, patients with hypothyroidism often complain of fatigue, excess sleeping, and weight gain. They also may complain of dry skin, some puffiness, and fluid retention.

Plaintiff introduced an exhibit listing signs and symptoms[14] of hypothyroidism and used this list in questioning expert witnesses about the diagnosis of hypothyroidism. See Plaintiff's Exhibit No. 64. The exhibit contained the following signs and symptoms which were not ranked by importance: dry skin, loss of outer third of the eyebrows, coarseness or loss of hair, hoarse voice, elevated liver enzymes, delayed deep tendon reflexes, hyponatremia (low sodium), hypokalemia (low potassium), EKG changes, constipation, tension, anxiety, depression, marked increase in cholesterol level, bradycardia, cold intolerance, carotenemia, puffy face or edema, hearing problems, inability to concentrate, psychosis, fatigue, weight gain, slow or slurred speech, and insomnia or sleep difficulties.

In reviewing this list, Dr. Braverman testified that elevated liver enzymes are not common in patients with hypothyroidism and are not mentioned in the chapter on the liver in his textbook, The Thyroid. He further testified that neither tension nor anxiety are listed in the major textbooks on

thyroid disease as major symptoms of hypothyroidism. Finally, Dr. Braverman testified that insomnia is a rare symptom in patients with hypothyroidism and that normally, hypothyroid patients sleep too much.

Dr. Braverman also testified that plaintiff's exhibit omitted one of the common symptoms of hypothyroidism: general muscular aches and pains. The Court accepts and adopts Dr. Braverman's assessment of the signs and symptoms of hypothyroidism as the findings of the Court.

**A. Failure to Diagnose**

**1. Dr. Cary**

■ The Court first will address whether Dr. Cary breached the applicable standard of care by failing to diagnose Senator East's hypothyroidism sometime between April, 1983, and April, 1985. As Senator East's primary care physician during this time period, Dr. Cary was responsible for coordinating Senator East's overall care, including information obtained from specialists such as Drs. Benjamin, Gemelli, and O'Connell, and consulting physicians such as Dr. Tucker.

The primary issue for the Court is whether Dr. Cary should have ordered a thyroid function test in the exercise of reasonable medical care sometime prior to the Senator's hospitalization in April, 1985. All of the experts agree that the standard of care for internists from 1983 to 1985 did not require that an internist perform a thyroid function test as part of a routine physical examination of an outpatient.[15]

Plaintiff's argument that the thyroid function test was inexpensive and simple to administer misses the point. There are hundreds of simple, inexpensive tests that internists could potentially order on a patient. The medical profession has weighed the costs and benefits in deciding which

13. Dr. Hughes, plaintiff's expert, testified on cross-examination that hypothyroidism is difficult to diagnose in its early stages because the symptoms are subtle, varied and nonspecific.

14. Dr. Hughes testified that "signs" describe what the doctor observes while "symptoms" describe the patient's complaints. He further testified that a certain condition might be both a sign and symptom where the doctor's observations and the patient's complaints coincide.

15. The experts also testified that thyroid function tests are not routinely ordered on outpatients today.

tests should be part of a routine examination and which ones should await a doctor's diagnosis based on a patient's presentation.

In diagnosing any medical illness, a doctor has access to three categories of information. First, the doctor receives information directly from the patient. This includes complaints made by the patient, the doctor's own observations and examination of the patient, and complaints or observations made by the patient to other doctors which are communicated to him. Second, the doctor obtains information from any laboratory tests that are ordered. Third, the doctor may receive information from third parties, such as friends or relatives of the patient.

Briefly, with respect to the third information category, the Court finds that plaintiff presented no evidence that she or any other relative or friend of Senator East communicated any information to Dr. Cary or the other government doctors that would have aided in their diagnosis of hypothyroidism prior to April, 1985. Mrs. East's sole contact with Dr. Cary was in July, 1983, when she spoke to him about her husband's urinary tract infection. According to her trial testimony, she attended only one session with Dr. Gemelli and did not discuss any signs or symptoms of hypothyroidism. While Mrs. East and several other plaintiff witnesses testified that they observed physical changes in Senator East from 1983 to 1985, there is no evidence that they communicated any such observations to Dr. Cary or any other government doctor.

In addressing the first information category concerning what Dr. Cary knew about Senator East's health from direct contact with him, it is instructive to review Dr. Tucker's observations of Senator East in 1982, just prior to the time Dr. Cary replaced Dr. Tucker as the Senator's primary care physician.[16]

In January, 1982, Senator East returned to Greenville for his annual physical examination with Dr. Tucker. Senator East complained to Dr. Tucker of sleeping problems, some nights waking up four to five times and then having trouble returning to sleep. Dr. Tucker thought these sleeping problems were due to the Senator's transition to the Senate and his new responsibilities. Dr. Tucker noticed that Senator East was experiencing "frequent twitchings of the jaw muscles," which he attributed to tension. Senator East told Dr. Tucker that he found his new job more stressful physically because of the distance between his home and his office and the required movements around the Capitol.

Senator East's blood pressure was borderline high, and Dr. Tucker recommended that he have it rechecked in Washington. Dr. Tucker also recommended that Senator East decrease his salt intake and try "relaxation and biofeedback techniques." On January 19, 1982, Dr. Tucker prescribed fifty 5 mg. tablets of Valium. Dr. Tucker relied upon Senator East to follow the recommendations testifying, "I think intelligent people you can rely on to take responsibility for following up on their potential health problems." The OAP records reveal that Senator East did not follow Dr. Tucker's recommendations.

Senator East again returned to Dr. Tucker for an annual physical examination at the end of 1982. According to Dr. Tucker, Senator East appeared pale and gaunt. Dr. Tucker noted in his records that Senator East "has controlled and eliminated anxiety which he felt last year. Did not need Valium last weeks even though more stressful than usual." An EKG taken of Senator East revealed non-specific T-wave changes. Dr. Tucker, a cardiologist like Dr. Cary, concluded that there was no evidence of any cardiac difficulty and did not feel the change should be further pursued.

16. In December, 1980, Dr. Tucker provided Dr. Cary with a summary of the Senator's medical history and copies of his recent EKG and other laboratory test results. After Dr. Cary's first physical examination of Senator East, Dr. Cary called Dr. Tucker and discussed the examination, in particular, the slightly abnormal EKG reading, hypertension, and the abnormal liver function tests. Dr. Tucker communicated his findings from Senator East's physical examinations in 1982 and mailed information to Dr. Cary concerning the Senator's hypertension and abnormal liver function tests.

Dr. Tucker also was not concerned about Senator East's blood pressure of 148/80. On December 30, 1982, Senator East was seen by one of Dr. Tucker's professional colleagues, Dr. Mark Dellasega, and complained of considerable stress in the Senate.

With this background, Senator East was seen by Dr. Cary on April 15, 1983,[17] concerning the Senator's low hemoglobin, elevated blood pressure, and complaints of job-related stress which mirrored the complaints the Senator had been making to Dr. Tucker in his two prior physical examinations. In response to these complaints, Dr. Cary scheduled the Senator for a complete physical examination on April 20, 1983.

In reconstructing what Senator East told Dr. Cary in April, 1983, the Court relies heavily on the medical records and a Health History Questionnaire completed by Senator East on April 19, 1983, a day before his April 20, 1983, physical examination. While the evidence establishes that Senator East did not bring the Health History Questionnaire to the physical examination and that it was never provided to Dr. Cary or made part of the Senator's medical records, the Court finds that the Senator's responses in the questionnaire are a reliable indicator of the symptoms of which he was aware at the time and might have communicated to Dr. Cary the next day. Perhaps even more significantly, the Questionnaire indicates those symptoms that Senator East denied experiencing and thus, most likely, did not communicate to Dr. Cary. Similarly, the Court finds the medical records to be a reliable source of information with respect to Senator East's complaints. The information contained in the medical records and the Health History Questionnaire are corroborated by Dr. Cary's testimony at trial which the Court found to be forthright and credible.

Based on the medical records, the Questionnaire, and Dr. Cary's testimony, Senator East's major complaint on April 20, 1983, was tension and anxiety which he related to his job. Dr. Cary's notes from the examination indicate the major problem area as hypertension and state:

> The patient states movement from the college atmosphere, where he was a full time teacher, to the United States Senate, was a type of future shock and has produced a number of stresses that he had not had before. He has recently been found to have elevated blood pressures and the physical examination was suggested because of that.

These are the same comments that Senator East had made previously to Dr. Tucker. During the physical examination, Dr. Cary did not observe or record any of the common manifestations of hypothyroidism. Dr. Cary's notes reflect examination of the Senator's skin and a negative finding.

The Health History Questionnaire corroborates the medical records and Dr. Cary's testimony. In it, Senator East reported having tension and anxiety, skin problems, periodic difficulty relaxing, periodic problems at work, periodic difficulty staying asleep, and high blood pressure. With the exception of skin problems, which Dr. Cary reported as negative, none of these are common symptoms of hypothyroidism. Conversely, in the Questionnaire, Senator East denied having many symptoms associated with hypothyroidism, including muscle or joint pains, itching skin, difficulty concentrating or remembering, loneliness or depression, weight gain, cold intolerance, difficulty hearing, and exhaustion or fatigue.

The Court finds that in April, 1983, the only common symptom of hypothyroidism of which Dr. Cary should have been aware is constipation. Dr. Cary related the Senator's constipation to being wheelchair bound with polio and learned, after receiving medical records from Dr. Tucker, that the Senator's constipation had persisted for over 15 years. While tension and anxiety are on plaintiff's list of symptoms of hypothyroidism, the Court accepts Dr. Braverman's testimony that tension and anxiety are not major symptoms and should be low on any such list.

17. The visit of April 15, 1983, was the first contact Senator East had with Dr. Cary, except for a brief visit in October, 1982, relating to an eye infection.

Plaintiff presented primarily four witnesses—Mrs. East, her two daughters, and Senate aide Calvin Kirven—who testified that they noticed some physical changes in Senator East consistent with hypothyroidism during the 1983 to April, 1985, time period. While the Court found this testimony unpersuasive in many respects, even if these witnesses did observe physical changes, none testified that they communicated their observations to Dr. Cary or any other government doctor. In addition, the Court did not accept plaintiff's testimony that Senator East had communicated such information to Dr. Cary or Dr. Gemelli.[18]

Accordingly, the testimony of plaintiff's witnesses is relevant only to the extent that Dr. Cary himself should have observed physical changes in Senator East. In this regard, the Court notes that it is satisfied, from the testimony of almost all of the experts, that Senator East was already hypothyroid when Dr. Cary saw him in April, 1983.[19] Unlike Dr. Tucker, who saw Senator East both before and after he was hypothyroid, Dr. Cary and the other government doctors did not have an opportunity to see Senator East before he was hypothyroid and, thus, to notice any changes.[20] Dr. Tucker, who did have this opportunity, never observed any physical changes prompting him to consider hypothyroidism, and none of the experts concluded that he violated the standard of care for not diagnosing the Senator's hypothyroidism.

Having found that no third party provided information to Dr. Cary with respect to signs or symptoms of hypothyroidism and that Dr. Cary learned very little from listening to and observing Senator East, there remains the final source of information, the laboratory test results.

In her post-trial brief and at closing argument, plaintiff emphasized the importance of the laboratory test results and asserted that Dr. Cary should have ordered a thyroid function test based on the laboratory tests alone. The Court strongly disagrees, finding no expert support for this position.

In 1983, Senator East's laboratory tests indicated hypertension, elevated liver enzymes, elevated cholesterol, and an abnormal EKG similar to the one observed in December, 1982, by Dr. Tucker.

Dr. Braverman testified authoritatively that hypertension is not a common complication of hypothyroidism and plays no role in its diagnosis. He indicated that the coexistence of the two conditions is due to the fact that a lot of hypothyroid patients are older and that older people tend to have higher blood pressure. Dr. Braverman testified that "stress unequivocally goes hand in hand with hypertension," and that the job-related stress that Senator East complained of during his April, 1983, physical examination adequately and reasonably explained his hypertension. Dr. Cary treated the Senator's hypertension with medication, returning his blood pressure to normal and lowering the Senator's pulse rate. Dr. Cary also prescribed a small 2 mg. dosage of Valium for the Senator's use in connection with his tension and anxiety.

18. For example, Mrs. East initially testified that she did not discuss with her husband the complaints that he made to Dr. Cary at the April 20, 1983, physical examination. However, the next day, Mrs. East changed her response to the same question, testifying that she knew from discussion with Senator East that he had told Dr. Cary about "his stressfulness and fatigue." As another example, Mrs. East testified at trial during direct examination that she was only present at the last session with Dr. Gemelli while, in deposition, she testified that she was present at 15–20 sessions. When confronted with her deposition testimony on cross-examination at trial, Mrs. East testified that by "attending sessions" she meant driving her husband to the sessions and waiting in the car.

19. The issue before the Court, of course, is not whether Senator East had hypothyroidism in 1983 or 1984, but whether the government doctors should have diagnosed it. While diagnosis is always easy in hindsight, it is often much more difficult under the circumstances existing at the time.

20. Dr. Braverman testified that because hypothyroidism is a gradual, progressive disease, the window of time in which a doctor sees a patient is very important. He further testified that Dr. Cary did not have the opportunity to see Senator East before he was hypothyroid which made it difficult for him to detect any physical changes consistent with hypothyroidism.

The Court finds that elevated liver enzymes are of little value in the diagnosis of hypothyroidism and, therefore, Dr. Cary did not violate the standard of care by failing to associate the abnormal liver tests with hypothyroidism. When asked at trial, Dr. Cary candidly stated that he was unaware that elevated liver enzymes were a sign of hypothyroidism. Dr. Braverman testified that elevated liver enzymes are not common in patients with hypothyroidism and are not a good indicator of hypothyroidism. Dr. Braverman testified that in his textbook, *The Thyroid*, the chapter on the liver does not mention elevated liver enzymes as being associated with hypothyroidism. Dr. Braverman testified that he has never diagnosed a patient's hypothyroidism based upon elevated liver enzymes and that he normally does not perform liver function tests on his thyroid patients. Furthermore, when he has performed liver function tests on thyroid patients as part of a routine battery, most do not have elevated liver enzymes.

Dr. Cary appropriately associated elevated liver enzymes with possible hepatitis or alcohol usage and referred Senator East to a specialist in gastroenterology, Dr. Benjamin. Dr. Benjamin could not determine the etiology of the elevated liver enzymes and recommended that the liver function tests be repeated in three to four month intervals.[21] Dr. Cary admitted at trial that he failed to repeat the liver enzyme tests within the time period recommended by Dr. Benjamin, not repeating the tests until fourteen months later at Senator East's next physical examination.

While plaintiff at trial and in argument to the Court placed much emphasis on this alleged violation of the standard of care, the Court finds it to be irrelevant. There was no evidence of liver disease or other harm to Senator East as a result of the tests not being repeated earlier. Nor, according to Dr. Braverman, would repeating the tests earlier, performing a liver biopsy, or referring the Senator back to Dr. Benja-

min have aided in the diagnosis of hypothyroidism. Thus, even if the failure to repeat the liver enzyme tests earlier were a breach of the standard of care, the Court finds that it did not proximately cause the alleged failure to diagnose Senator East's condition.

The third laboratory value pointed to by plaintiff is the Senator's cholesterol level. The experts all agree that an elevated cholesterol level can be a sign of hypothyroidism. When measured on April 20, 1983, Senator East's cholesterol level was 275 which placed it at the upper end of the normal range. Dr. Cary testified credibly that this was not an unusual level and that at least 50 percent of the senators had cholesterol levels in this range. Dr. Canary also testified that a study had indicated that the 275 value was lower than 86 percent of patients with hypothyroidism.

Although the 275 value was still within the normal range, Dr. Cary was concerned about the value and told Senator East that he thought his cholesterol was too high. Dr. Cary attributed the borderline high cholesterol level to the Senator's diet and advised him to modify his diet. Physicians are trained to look for the most common and obvious explanations for problems, and reasonable medical care recommends this approach. The Court finds that Dr. Cary reasonably attributed the Senator's higher cholesterol level to diet and agrees with Dr. Braverman that a thyroid function test was not required by this nonspecific laboratory value.

Finally, the 1983 physical examination revealed a flattening of the T-waves in Senator East's EKG results. Dr. Cary noted a change from a December, 1980, EKG that Dr. Tucker had sent him and called Dr. Tucker about these changes. Dr. Tucker told Dr. Cary that these changes had been present in December, 1982.

Dr. Hughes testified, and the Court accepts, that the etiology of the type of non-

---

21. Dr. Benjamin issued a report on April 21, 1983, recommending reevaluation of the liver enzyme tests in six months and then, apparently, redictated a report on May 12, 1983, recom-

mending retesting in three to four month intervals. The Court finds the discrepancy immaterial.

specific T-wave changes exhibited by Senator East in 1982 and 1983 is, in most cases, never found. Dr. Cary, a board certified cardiologist, examined the Senator's heart and found no physical cause to explain the EKG reading. Similarly, Dr. Tucker, also a cardiologist, concluded that there was no evidence of any cardiac difficulty and did not feel the changes needed to be pursued.

Dr. Hughes testified that there are multiple possible causes for these EKG changes, including hypertension, which the Senator exhibited in 1982 and 1983. Dr. Hughes indicated that, commonly, the follow-up for a nonspecific T-wave change is another EKG, which Dr. Cary ordered at the Senator's next physical examination and which showed no changes from the 1982 and 1983 readings.

Dr. Braverman testified to a reasonable degree of medical certainty that Dr. Cary was not required to test for hypothyroidism in 1983 because Senator East presented with none of the classic signs or symptoms of hypothyroidism. The Court agrees with Dr. Braverman and finds that that the standard of care did not require Dr. Cary to order a thyroid function test in 1983.

The Court notes that Dr. Tucker had as much or more information about Senator East's health as of 1983, and plaintiff's expert internist, Dr. Hughes, testified that Dr. Tucker complied with the standard of care in all respects.

While plaintiff's experts assert that Dr. Cary never performed a differential diagnosis,[22] Dr. Braverman testified that Dr. Cary did create a problem list and formulate a plan for treating the problems. Dr. Hughes testified that Dr. Cary used a recordkeeping technique called SOAP.[23] The Court finds that Dr. Cary's diagnostic approach, while perhaps not optimal, did meet the standard of care for internists.

In the summer of 1983, Dr. Cary referred Senator East to Dr. Gemelli, a Navy psychiatrist, concerning the Senator's continuing tension and anxiety which the Senator related to his job. After about six weeks with Dr. Gemelli, the medical records indicate that the Senator's "depressive troughs" had almost totally disappeared, and he only had "occasional brief periods of tension." Dr. Cary was aware of the Senator's psychotherapy sessions with Dr. Gemelli and their progress. Dr. Braverman testified that the improvement in the Senator's depression with psychotherapy and Valium was inconsistent with what a patient with hypothyroidism would report.

From August, 1983, until the end of the year, Senator East's complaints to the OAP related primarily to urinary tract difficulties and not to any condition consistent with hypothyroidism.

From January until June, 1983, Senator East made infrequent visits to the OAP primarily to monitor his blood pressure which was well-controlled on medication. Senator East reported to Dr. Cary that he was doing "quite well" on small amounts of Valium and Dalmane.

On June 18, 1984, Dr. Cary performed a second annual physical examination. Senator East presented without any new physical or psychiatric complaints. As in 1983, there were no physical findings or complaints from Senator East consistent with hypothyroidism except for depression and constipation which, in the Senator's case, may or may not have been associated with hypothyroidism. Dr. Cary concluded in the examination record that the Senator's health remained unchanged.

As in 1983, Dr. Cary's notes in the medical records reflect examination of the Senator's skin and a negative finding. The lab-

---

**22.** Differential diagnosis describes the method whereby doctors list possible causes or explanations for a patient's health problem and then proceed to test and rule out the items on the list until a satisfactory explanation is found. Doctors look for possible causes that best explain a patient's signs and symptoms and, generally, attempt to rule out the most common causes or explanations first.

**23.** With this technique, Dr. Hughes testified that a doctor records the following with respect to each complaint or problem area: Subject of complaint (*what the patient said*), Objective (what the doctor thought), Anatomic (what the doctor observed or found), and Plan (what the doctor planned to do).

oratory tests revealed that Senator East's hypertension was still well-controlled, that his EKG continued to show the same abnormalities as 1982 and 1983, that the liver function tests continued to show abnormalities of undetermined etiology, and that his cholesterol level had dropped almost 50 points since 1983, from 275 to 228.

Dr. Braverman testified that the applicable standard of care for internists did not require that Dr. Cary order a thyroid function test in June, 1984, finding that Senator East still did not present with any of the classic symptoms of hypothyroidism. Dr. Braverman testified that it is very difficult to evaluate a patient for an illness where the patient relates no symptoms of that illness. The Court finds this testimony by Dr. Braverman significant and persuasive.

In reaching his conclusions, Dr. Braverman relied in part on a Post-poliomyelitis Research Survey completed by Senator East on April 22, 1984. While much shorter and less revealing than the 1983 Health History Questionnaire, in this survey Senator East identifies the presence or absence of certain symptoms in April, 1984, and, accordingly, sheds some light on what he might have told Dr. Cary in June, 1984.

In the survey, Senator East indicated that he had not noticed any new excessive fatigue or muscle aches and pains since his maximum recovery from polio. Dr. Braverman testified that excessive fatigue and muscles aches and pains are some of the major symptoms of hypothyroidism. The Court finds that Senator East did not communicate these symptoms to Dr. Cary in July, 1984.

In finding no breach of the standard of care, Dr. Braverman also referred to factors that would have made the diagnosis of hypothyroidism more difficult in 1984. He testified that the 48 point drop in Senator East's cholesterol level was a confounding factor in diagnosing hypothyroidism because a decrease of this magnitude is very unusual for a patient with progressive hypothyroidism. Most patients with progressive hypothyroidism experience an increase in their cholesterol levels. With respect to Senator East's EKG which was almost identical to the one in 1983, Dr. Braverman stated that with progressive hypothyroidism the EKG often becomes progressively worse and other signs would appear, none of which were evident in the 1984 EKG. The final confounding factor was that Senator East's depression improved with psychotherapy and Valium, as reported to Dr. Cary, which is inconsistent with hypothyroidism.

The Court finds that in June, 1984, Senator East was not presenting with the classic signs and symptoms of hypothyroidism and that the standard of care did not require Dr. Cary to order a thyroid function test at that time. Senator East's presentation in June, 1984, was as devoid of the classic symptoms of hypothyroidism as in 1983 and, in addition, included confounding factors that, if anything, made it less likely that an internist would consider hypothyroidism.

After his second physical examination in June, 1984, Senator East's contact with the OAP was extremely limited for the remainder of the year. He saw Dr. Cary twice in August, 1984, once concerning his blood pressure and anxiety and once concerning a muscle strain resulting from being lifted from the swimming pool. In September, 1984, Dr. Cary arranged regular consultations for Senator East with Dr. Gemelli, and Dr. Belmont, a staff physician at the OAP, saw Senator East for a one-hour counseling session concerning his bowel regimen. Senator East had no contact with physicians at the OAP from September 12, 1984, until January 22, 1985, when Senator East telephoned Dr. Cary, complaining of feeling "fatigued and listless recently."

In view of the Senator's previous elevated liver enzymes and past history of anemia, Dr. Cary scheduled blood examinations for the next day. The results indicated that two of the three liver function tests were returning to normal but revealed low potassium and sodium levels. Dr. Cary attributed the Senator's recent fatigue to the low potassium and sodium. He prescribed a potassium supplement and planned to repeat the potassium test in a week.

On January 30, 1985, Senator East called the OAP, complaining of urinary retention and obstruction, requesting to see a urologist. Dr. Belmont at the OAP referred Senator East to Dr. O'Connell, a urologist at the Bethesda Naval Hospital, for a consultation the same day. Dr. O'Connell evaluated Senator East and determined that a TURP operation would be necessary to remove the obstruction. Dr. O'Connell and an anesthesiologist performed a thorough preoperative evaluation and discovered that Senator East had a very low potassium level.

Dr. Cary's progress note on February 1, 1985, indicates that Dr. O'Connell delayed the surgery because of the low potassium level. The note also reflects that Senator East had been on a salt restricted diet, as well as his antihypertensive medication, and that he had not returned for follow-up since the low potassium had been discovered a week earlier. Drs. Cary and O'Connell felt that the low potassium and sodium levels were related to the antihypertensive medication, which is a diuretic, to a salt restricted diet and to excess water ingestion.

Dr. Cary failed to bring the low potassium reading to Dr. O'Connell's attention. Whether or not this was a breach of the standard of care, it was not the proximate cause of any harm to Senator East.

After the low potassium level was corrected, Senator East was deemed an excellent candidate for surgery, and on February 2, 1985, the operation was performed successfully, removing the median bar obstruction and enabling the Senator to urinate.

Upon discharge, Senator East was instructed to return to the OAP for follow-up on his electrolytes.[24] Senator East telephoned the OAP three days later to report that he was "doing quite well" and never returned for a follow-up.

Drs. Hughes and Canary testified that Dr. Cary should have ordered a thyroid function test in 1985 because of the low potassium and sodium readings, which both doctors claimed were common symptoms of hypothyroidism, and because of the Senator's complaints of fatigue and listlessness.[25]

With respect to Senator East's complaint of recent fatigue and listlessness in January, 1985, the fact that Dr. Cary recorded this complaint and described it as recent reinforces the Court's finding that Senator East had not previously complained of these symptoms. In response to the Senator's complaints in January, 1985, Dr. Cary scheduled blood tests which revealed the low electrolytes. The Court finds that Dr. Cary reasonably attributed the Senator's fatigue and listlessness to the electrolytes. Dr. Braverman testified that the diuretic and the low electrolytes, especially low potassium, could have caused the fatigue and listlessness. In addition, the fact that Senator East reported to the OAP that he was doing well three days after his TURP operation in February, 1985, supports a reasonable inference that the Senator's recent fatigue and listlessness had resolved and were not chronic symptoms consistent with hypothyroidism.

With respect to the low electrolytes, Dr. Braverman testified that low potassium and sodium are not common signs of hypothyroidism and would not have alerted a reasonable internist to order a thyroid function test. In this case, Dr. Braverman expressed the opinion that the low readings were probably unrelated to hypothyroidism because Senator East had persistently low

24. Electrolytes refer herein to the potassium and sodium levels.

25. Dr. Canary also criticized Dr. Cary for failing to discuss each of Senator East's past laboratory abnormalities with Dr. O'Connell, and Dr. Hughes testified that Dr. Cary should have visited Senator East in the hospital and reviewed the hospital records. The Court rejects these criticisms. Senator East was referred to Dr. O'Connell for urological problems, and Dr. O'Connell was his primary physician during the hospitalization. Dr. Cary's role was that of a consultant; in fact, he did not have privileges at Bethesda Naval Hospital and, thus, could not admit patients, nor direct their care there. Dr. Cary did visit Senator East during the hospitalization and kept apprised of his situation through telephone conversations with Dr. O'Connell.

serum sodium three months after he had become euthyroid. In September, 1985, Senator East was admitted to Pitt County Memorial Hospital for urinary problems and found to have low potassium and sodium which was ascribed to excess water intake. Dr. Braverman concluded that the low electrolytes were probably related to the diuretic and excess water intake.

With respect to other potential symptoms of hypothyroidism in 1985, they basically remained unchanged, except for the Senator's depression, which responded well to psychotherapy and Valium. The marked improvement in the Senator's condition was not suggestive of an organic illness like hypothyroidism.

With respect to the laboratory tests in 1985, Dr. Cary knew that two of the three liver function tests were returning to normal. To the extent that the abnormal liver enzymes were indicative at all of hypothyroidism, the decrease in the two tests was atypical for a progressive disease like hypothyroidism. Dr. Cary did not perform any further cholesterol test or EKG prior to April, 1985, but knew from the previous physical examination in June, 1984, that the Senator's cholesterol had decreased fifty points and that the Senator's EKG had remained basically unchanged since December, 1982. For the reasons stated in discussing the June, 1984, examination, the decrease in cholesterol and the unchanged EKG reading were not suggestive of a progressive disease and actually may have made it more difficult to diagnose hypothyroidism.

Finally, plaintiff asserts that in the October 22, 1985, confrontation between Senator East and Dr. Cary, Dr. Cary admitted that he thought of testing for hypothyroidism but never did. The Court rejects plaintiff's version of the events, finding Dr. Cary's testimony more credible. Dr. Cary testified that he apologized to Senator East and that if he had thought of thyroid disease, he would have ordered a thyroid function test. The medical record corroborates Dr. Cary's testimony—in every situation where he felt a test was required, Dr. Cary performed the test, and when he felt a specialist was needed, he referred Senator East to a specialist.

For all the foregoing reasons, the Court finds that the applicable standard of care did not require Dr. Cary to order a thyroid function test prior to April, 1985. The Court finds that Senator East did not present with the classic signs and symptoms of hypothyroidism and that the few signs and symptoms that did exist were too nonspecific to require a thyroid function test. While in hindsight it is clear that Senator East was hypothyroid for a period of time prior to April, 1985, perhaps going as far back as late 1982, and while it is truly unfortunate that Senator East's hypothyroidism progressed to such an extreme stage, the Court finds that Senator East's presentation between April, 1983, and April, 1985, would not have led a reasonable internist, under the circumstances as they existed for Dr. Cary, to test for hypothyroidism.

### 2. Dr. Gemelli

Plaintiff also claims that Dr. Gemelli should have diagnosed Senator East's hypothyroidism some time prior to April, 1985. The issue before the Court is whether a reasonable psychiatrist under the same circumstances as existed for Dr. Gemelli would have ordered a thyroid function test.

■ The Court notes at the outset that Dr. Gemelli saw Senator East on the basis of a specific referral from Dr. Cary. As such, the Court finds, contrary to the testimony of plaintiff's experts, that the standard of care did not require Dr. Gemelli to repeat or reevaluate Dr. Cary's complete physical examination before addressing the symptoms for which he had been referred. The Court has previously found, in any event, that the signs and symptoms presented to Dr. Cary would not have led a reasonable internist to test for hypothyroidism.

■ The psychiatrist's primary responsibility is to evaluate and treat the patient's mental condition. Since many psychological problems have an organic basis, this responsibility includes determining whether

there might be an organic etiology for the psychological problems. Drs. Rubin and Keller testified, and the Court finds, that the standard of care between 1983 and 1985 did not require a psychiatrist to perform a thyroid function test on all outpatients complaining of depression.[26] Rather, the standard of care required a psychiatrist to order a thyroid function test where the patient presented with signs and symptoms suggestive of an organic illness involving the thyroid. Dr. Keller testified that a psychiatrist should focus on an organic etiology where there is evidence of confused or disorganized thought processes, speech changes or incoherence, changes in physical appearance, or physical complaints.

While the Court finds that Dr. Gemelli's testimony lacked credibility in certain respects,[27] the Court believed his testimony that Senator East did not present with signs and symptoms consistent with an organic etiology for his tension, anxiety, and depression. Consistent with the Health History Questionnaire, the Post–Poliomyelitis Survey and his communications with Dr. Cary, the Court finds that Senator East did not complain to Dr. Gemelli of any physical symptoms of hypothyroidism. The Court further finds that Senator East focused on situational factors during his therapy sessions and that his mental condition improved for periods of time with psychotherapy, Valium, and changes in his environment.

These factual findings are not suggestive of an organic etiology for the Senator's psychological problems. The depression associated with an organic illness such as hypothyroidism typically is unremitting and manifests itself in excessive fatigue and other physical changes.

26. Drs. Rubin and Keller further testified that the standard of care today does not require psychiatrists to order thyroid function tests on all outpatients complaining of depression.

27. For example, the Court finds incredible that Dr. Gemelli could pinpoint what Senator East said at each session more than five years earlier despite having stopped taking notes during the second session in 1983. Dr. Gemelli stopped taking notes because Senator East expressed ex-

Dr. Gemelli first met Senator East in early July, 1983, having received a request from Dr. Cary specifically to evaluate the Senator's job-related stress. Between July and October, 1983, Dr. Gemelli met with Senator East approximately eight to ten times. Prior to their first meeting at the OAP, Dr. Gemelli reviewed the Senator's OAP chart and found the Senator's health excellent. Dr. Gemelli testified that he noted nothing unusual about the Senator's physical appearance and that the Senator's appearance never changed between June, 1983, and his hospitalization in April, 1985, nor did Dr. Gemelli ever observe any sign of intellectual impairment during this time.

Dr. Gemelli evaluated Senator East during the first three sessions and found no evidence of an organic illness. At each of these sessions, Dr. Gemelli performed a mental status examination by speaking with Senator East and observing his thought processes. Dr. Gemelli testified that Senator East was not confused and was obviously a bright and articulate person. He further testified that Senator East never complained of fatigue, lethargy, loss of memory, or difficulty concentrating, and that Senator East focused on situational factors for his tension and anxiety.

Dr. Gemelli testified that during the sessions Senator East complained of the stresses of meeting a hectic Senate schedule while in a wheelchair and was obsessed over whether to seek a second term in the Senate. While Senator East enjoyed the intellectual and debating aspects of the Senate, he found the practical and technical aspects of legislation, which comprised much of his time, tedious and boring. Dr. Gemelli felt that Senator East was afraid of becoming a quitter like his brother, who had committed suicide, and afraid of disap-

treme concern about confidentiality and indicated he would not continue the sessions if notes were kept. Dr. Gemelli frequently discussed the Senator's health with Dr. Cary, and his prescription of medications for the Senator was reflected in the OAP's medical records. While critical of Dr. Gemelli for not keeping notes, plaintiff's experts, Drs. Cavanaugh and Whybrow, did not find that this was a breach of the standard of care.

pointing Senator Helms who had helped in his election to the Senate.

In August, 1983, there is evidence that the Senator's periodic depression remitted with environmental changes. On August 24, 1983, Dr. Dolan at the OAP recorded a telephone conversation with Senator East in which the Senator reported that under a regimen of relaxation, swimming, and rest, prescribed by Dr. Gemelli, "the depressive troughs" had almost totally disappeared, leaving only brief periods of tension and insomnia for which he was taking medication.

Upon returning after the summer 1983 recess, Senator East told Dr. Gemelli that he felt much better being back in North Carolina and that he no longer felt anxious or depressed since he had put the decision of whether to run for reelection out of his mind. Dr. Gemelli recommended continuing therapy but advised the Senator that he would have to see him at his office at Bethesda Naval Hospital rather than the OAP or provide him with a referral for a psychiatrist closer by. Senator East elected to discontinue therapy and did not contact Dr. Gemelli for about a year between the fall of 1983 and the fall of 1984.[28]

For all the foregoing reasons, the Court finds that Dr. Gemelli did not breach the standard of care by failing to order a thyroid function test sometime prior to the diagnosis of hypothyroidism on April 25, 1985. Senator East did not present with the type of depression that would be associated with an organic etiology and did not present with physical or mental symptoms suggestive of hypothyroidism. In addition, the Court notes that Dr. Liverman, a private psychiatrist, saw Senator East on fifteen occasions in the two months immediately preceding his admission to Bethesda Naval Hospital with myxedema psychosis and that plaintiff's expert, Dr. Cavanaugh,

testified that Dr. Liverman did not breach the standard of care by failing to perform a thyroid function test.

While the Court need not reach this issue, the Court finds that Senator East's depression was not caused by his hypothyroidism, although the hypothyroidism exacerbated the problem. The Court finds that Senator East was suffering from two separate, but interlocking, illnesses: depression and hypothyroidism.

In support of this finding, the Court notes that Senator East's depression continued after he became euthyroid. Dr. Braverman testified persuasively that any psychological problems associated with hypothyroidism would have resolved when the synthetic thyroid hormone medication returned the Senator to a euthyroid state. The Court did not find persuasive Dr. Whybrow's testimony to the contrary, based in large part on anecdotal evidence from his article in 1969 involving two women who were cognitively impaired after allegedly becoming euthyroid. In addition, the Court notes the expert testimony that depression is genetic and that Senator East was two to five times more likely to suffer a severe depression in his life because his brother suffered a severe depression and committed suicide.

### 3. Dr. O'Connell

■ Plaintiff also claims that Dr. O'Connell, who performed the TURP operation on Senator East in February, 1985, shares responsibility for the government's failure to diagnose hypothyroidism and order a thyroid function test prior to April, 1985. Plaintiff devoted only two and one-half pages in her 115-page brief to Dr. O'Connell and only one or two statements in closing argument. The Court will give

---

**28.** Plaintiff contends that Senator East saw Dr. Gemelli without interruption or improvement from July, 1983, through January, 1985. The medical records support Dr. Gemelli's version of the medical history. The OAP progress notes reflect a series of contacts between Dr. Gemelli and the OAP in July, August, and September, 1983, after which there are no notes of any interaction with Dr. Gemelli until September 10,

1984, when Dr. Cary describes a telephone conversation "regarding arrangements for some consultations to be held on a regular basis." Dr. Cary testified that this note referred to meetings between Dr. Gemelli and Senator East. For these reasons, the Court finds by a preponderance of the evidence that Senator East did discontinue therapy with Dr. Gemelli for a year between the fall of 1983 and the fall of 1984.

this claim similar summary treatment because it is clearly without merit.

On January 30, 1985, Senator East presented at Bethesda Naval Hospital in severe discomfort from an inability to urinate. Dr. O'Connell, Chairman of the Department of Urology at Bethesda, examined the Senator and removed a large volume of residual urine. The next day, Dr. O'Connell performed a cystoscopy, a procedure enabling him to visually examine the urethra and bladder. The cystoscopy revealed an obstruction preventing urination called a median bar deformity. On February 2, 1985, Dr. O'Connell performed the TURP operation, removing the obstruction, after which Senator East was able to urinate.

Plaintiff presented no expert testimony that the TURP operation was unnecessary or performed improperly. To the contrary, the evidence establishes that Dr. O'Connell carefully evaluated and screened the Senator for the surgery and performed the operation expertly. Plaintiff contends, however, that Dr. O'Connell, through consultation with Dr. Cary and observation of Senator East, should have suspected hypothyroidism and either ordered a thyroid function test or referred the Senator to an endocrinologist. The Court rejects this contention.

As with Dr. Gemelli, the Court notes at the outset that Dr. O'Connell was operating under a referral for a specific and, in this case, rather urgent problem. Senator East could not urinate and was in severe discomfort. It was not Dr. O'Connell's role or responsibility to do a complete physical examination and to ponder what other physical ailments Senator East may have been experiencing in his life. Dr. O'Connell saw Senator East for a specific problem which he evaluated and resolved in a professional manner.

The Court finds that the standard of care did not require Dr. O'Connell to test for hypothyroidism or refer Senator East to an endocrinologist in 1985. The Court's finding is amply supported by the testimony of defendant's expert, Dr. Patrick Craig Walsh, Director of the Department of Urology and Chief of the Brady Urological Institute at Johns Hopkins. Dr. Walsh's academic background and clinical experience are impressive, and the Court found his testimony to be persuasive and authoritative in the field of urology.[29]

Dr. Walsh testified that urinary retention is not associated with hypothyroidism and that, in his many years of practice, he has never referred a patient complaining of urinary retention to an endocrinologist based on a suspicion of hypothyroidism. He found that Senator East's problems with urinary retention were caused by his wasted abdominal musculature and the presence of a blockage. As evidence supporting this finding, Senator East was in urinary retention in late September, 1985, well after becoming euthyroid, with what doctors at Pitt County Memorial Hospital described as a bladder neck contracture and a hypotonic [30] bladder.[31]

Plaintiff's expert, Dr. Canary, an endocrinologist who has never practiced urology or performed a TURP operation, testified as a practicing physician and surgeon that Dr. O'Connell breached the standard of care in 1985; the Court did not find his testimony persuasive in this area.[32]

---

**29.** Dr. Walsh is senior editor of the major textbook on urology and is also an editor of the primary urological journal. Dr. Walsh has performed between 500 and 1,000 TURP operations.

**30.** *Hypotonic means low muscle tone.*

**31.** Dr. O'Connell had advised Mrs. East in February, 1985, of the possibility of the reoccurrence of the urinary retention because of Senator East's weak abdominal musculature, as well as the small amount of blockage.

**32.** For example, Dr. Canary testified that Dr. O'Connell should have attributed low temperatures experienced by Senator East during his hospitalization to hypothyroidism. Drs. Walsh and O'Connell testified that the post-operative temperature readings were quite normal for a patient undergoing constant irrigation of cold water into his bladder and that the Senator's temperature readings later returned to normal. In addition, the Court notes that plaintiff's expert internist, Dr. Hughes, found nothing wrong with the care rendered by Dr. O'Connell to Senator East.

(

## B. *Failure to Provide Adequate Psychiatric Follow-up*

Plaintiff asserts that Drs. Gemelli, Hogan and Cary breached the standard of care by failing either to provide or arrange psychiatric care for the Senator between September, 1985, and June, 1986.[33] The experts for both plaintiff and defendant agree that if Senator East had received psychiatric care during the last nine months of his life he, in all likelihood, would not have committed suicide. Based on the course of Senator East's medical treatment following his discharge from Bethesda in May, 1985, and the actions of Senator and Mrs. East during this time period, the Court finds plaintiff's assertion to be without merit.

After his discharge from Bethesda Naval Hospital in May, 1985, Senator East was seen as an outpatient by Bethesda doctors to monitor his thyroid hormone levels and to treat his depression. During the summer of 1985, Dr. Richardson saw Senator East for psychiatric follow-up on approximately ten occasions, the last time being August 5. On that date, Dr. Richardson learned that Senator East was returning to North Carolina for the summer recess. Dr. Richardson recommended that Senator East follow up with Dr. Tucker in two weeks for evaluation of his depression and scheduled a return appointment at Bethesda Naval Hospital for September 9, 1985.

Senator East missed the September appointment, remaining in North Carolina until early October. Dr. Richardson made several attempts to contact Senator East, including attempts to reach him at his office and home but never heard back from him.[34] According to Drs. Rubin and Keller, Dr. Richardson's attempts to contact and reengage Senator East for psychiatric follow-up complied with the standard of care.

While plaintiff does not allege any negligence by Dr. Richardson, plaintiff asserts that Drs. Gemelli, Hogan, and Cary violated the standard of care by failing to get Senator East back into psychiatric care after his return from North Carolina in October, 1985.

By October, 1985, as a result of his anger over their failure to diagnose his hypothyroidism earlier, Senator East had effectively fired Dr. Cary, Dr. Gemelli and the Bethesda psychiatrists. The Court finds that it would have been fruitless, and perhaps unethical, for Drs. Gemelli, Hogan, and Cary to have attempted to force psychiatric care upon Senator East, especially when the Senator was under the care of other doctors.[35] In addition, Senator East's conduct from the fall of 1985 until his death clearly demonstrates that he had decided not to seek either psychiatric care or psychometric testing. If Senator East's closest aides and private doctors, whom he trusted, could not persuade him to seek psychiatric care, there was no way that Drs. Cary, Gemelli, and Hogan would have succeeded.

During the summer and fall of 1985, Senator and Mrs. East made it clear that they were angry with Dr. Cary and the Bethesda doctors for failing to diagnose his hypothyroidism earlier. On July 22, 1985, Mrs. East told Dr. Richardson of her "rage" at Dr. Cary for not diagnosing the Senator's hypothyroidism earlier. Senator East discussed his dissatisfaction with the government doctors at least twice with his press secretary, Jerry Woodruff, and told his administrative assistant, Rick Valentine, that he felt that Dr. Cary was totally incompetent.

On October 23, 1985, when there was an inconsistency between blood test results re-

**33.** This claim was not raised in the Complaint, and Dr. Hogan was never even mentioned in the Complaint.

**34.** Dr. Richardson's last entry in the medical records on November 20, 1985, states that Senator East had chosen not to call or visit the psychiatric clinic, despite being encouraged to do so while at the endocrine clinic at Bethesda Naval Hospital.

**35.** The experts agreed that a doctor can not force a patient into psychiatric treatment unless the patient qualifies for involuntary commitment; they also agreed that Senator East could not have been involuntarily committed at any time in 1985 or 1986.

ported by the OAP and Bethesda, Senator East angrily confronted Dr. Cary, accusing him of being incompetent and ruining his career. Senator East effectively fired Dr. Cary on that day. He never saw Dr. Cary again, expressing his anger at Dr. Cary to numerous individuals and consulting an attorney [36] to sue him.

Once referred to Dr. Canary in October, 1985, Senator East told an aide that he had no intention of returning to Dr. Cary.[37] On December 11, 1985, following his discharge from Georgetown University Hospital, Dr. Jackson noted: "The patient has asked that follow-up general care be provided by me and does not wish to return to Bethesda Naval Hospital for follow-up."

With respect to Senator East's refusal to seek psychiatric care between August, 1985, and his death, no less than six physicians recommended to Senator East that he should continue to receive psychiatric treatment for his depression or undergo psychometric testing for his perceived cognitive impairment. Dr. Jackson, who was the only doctor to see Senator East from December 6, 1985, until his death, recommended that Senator East seek psychiatric care on multiple occasions during this time period. Unfortunately, Senator East rejected the advice of all these doctors and never sought psychiatric care.[38]

As of the fall of 1985, Senator East had not been in regular treatment with Dr. Gemelli for almost a year, had never been treated by Dr. Hogan, and considered Dr. Cary incompetent.

For all the foregoing reasons, the Court finds that Drs. Gemelli, Hogan, and Cary did not breach the applicable standard of care by failing to provide or arrange psychiatric care for Senator East between September, 1985, and his death.

**36.** The attorney was James A. Hourihan from Hogan and Hartson in Washington, D.C., who currently represents plaintiff in this action.

**37.** Dr. Cavanaugh testified that Mrs. East had told him that as early as August, 1985, the Senator did not want to return to Dr. Cary.

**38.** Plaintiff's experts testified that the private doctors who saw Senator East in the fall of 1985 and in 1986 properly discharged their duty by

## III

Having determined that there was no negligence on the part of the government doctors, the Court need not address the issue of whether defendant would have been liable for Senator East's suicide if negligence had been established.

This is truly a tragic case, and the Court recognizes how difficult this litigation must have been for Senator East's entire family. However, the Court has determined, after a lengthy and careful review of the testimony and exhibits, that the medical care rendered by the government doctors, while clearly not perfect, does not establish liability in this case. Judgment will be entered in favor of the defendant.

merely recommending either psychiatric care or psychometric testing to the Senator. Dr. Canary twice recommended to Senator East that he undergo psychometric testing but the Senator refused. Dr. Canary testified candidly that he could do no more than recommend the testing to the Senator who was competent to make his own decisions. The Court finds no basis for holding the government doctors to a higher standard than the private doctors.